**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

─────────────────────────────────

**UNITED STATES OF AMERICA,**

                         **Plaintiff,**

  **v.**

                                                              **21-CR-44V**

**ZACHARY T. FEETERMAN,**

                         **Defendant.**

─────────────────────────────────

<u>**REPORT, RECOMMENDATION AND ORDER**</u>

      This case was referred to the undersigned by the Hon. Lawrence J.

Vilardo, in accordance with 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and

report upon dispositive motions.

<u>**PRELIMINARY STATEMENT**</u>

      The defendant, Zachary Feeterman ("the defendant"), is charged in an

indictment with having violated Title 18 U.S.C. §§ 2252A(a)(A) and 2252A(b)(1) (Count

1) and 2252A(a)(5)(B) and 2252A(b)(2) (Count 2).   Dkt. #25.   He filed a motion

seeking to have evidence seized without a search warrant from him on August 8, 2019

suppressed as evidence at his trial as well as statements made by him "without the

benefit of *Miranda* warnings."   Dkt. #35.   The government filed its opposition to this

motion.   Dkt. #37.   A reply was filed by the defendant.   Dkt. #38.   An evidentiary

hearing was conducted by this Court on June 18, July 30 and September 30, 2021.

Post-hearing memoranda were filed by the parties on January 10, 2022 and the matter

was taken under advisement.   Dkt. #s 62, 63.


## FACTS[1]


The defendant was convicted under New York State law of "attempted

criminal possession of child pornography for which he was issued an Order of Probation

which set forth the conditions of probation that the court had placed on him.   T1, p. 8.

(See Government Exhibit 1).   Erie County Probation Officer Teresa Duffy ("P.O. Duffy")

was assigned the defendant as "a probationer to [her]" for purposes of supervising him

and monitoring him for purposes of making sure he complied with these conditions of

probation as set forth in the Order of Probation (Government Exhibit 1).   As part of this

supervisory process, P.O. Duffy reviewed the Order of Probation with the defendant by

reviewing "each individual condition of probation" which she thoroughly explained to the

defendant.   T1, p. 27.   Supervision of the defendant also included "home visits" to his

place of residence, some of which are "announced" and are "unannounced."   T1, p. 5.

Sometimes, as part of the home visit process, the probation officers "will contact local

law enforcement officers to help [them]" if they "believe there is a crime that has

occurred" because "they would also do the actual arrest or investigation" or aid them "in

---

[1] The facts are taken from the transcripts of the evidentiary hearing conducted by this Court on June 18, 2021 (Dkt. #46) and September 30, 2021 (Dkt. #51) followed by the appropriate page number.   The June 18, 2021 transcript is designated as "T1" and the September 30, 2021 transcript is designated at "T2."

anything [they] may need while [they are] in the home."   T1, p. 6.

On August 8, 2019, Probation Officers LaPorta and Duffy made a home visit to defendant's home as a scheduled home visit.   When they went to the side door of the house, which they normally did, they rang the bell and knocked on the door but there was no answer.   After waiting a period of time "longer than normal," they knocked and rang the doorbell again, and the defendant answered the door a "minute or so later."   He seemed "a little flustered" and "nervous a little bit."   P.O. Duffy asked him, "What's going on?" and he responded, "Nothing."   The defendant's reactions were "different [from those] on previous occasions."   The officers entered the residence and proceeded into the defendant's bedroom.   The defendant continued to appear "uneasy" and "uncomfortable" by his "body language."   While P.O. Duffy was asking the defendant what was going on, P.O. LaPorta observed a "power cord next to [the defendant's] bed with several wires" which were in "plain view."   P.O. LaPorta asked the defendant, "What are all these cords, wires for?" and he responded that they were for a "flip phone" and "for a vape."   P.O. LaPorta also observed another cord that was leading to his bed underneath his pillows.   She followed this cord and determined that it was attached to a Samsung Galaxy phone which was under a pillow on his bed. Possession of this phone by the defendant constituted a violation of his conditions of probation "because he is not to possess a smart phone with internet capabilities or picture taking capabilities."   (*See* Government Exhibit 10).   T1, pp. 37-40; T2, pp. 7-17, 63-64.

3

P.O Duffy asked the defendant how long he had the phone because he was not supposed to have it.   The defendant responded that he had it "since the beginning of probation" and that "it was his phone."   T1, pp. 40-41.

P.O. LaPorta knew that a password was needed to open the Samsung phone, so she asked the defendant for the password which the defendant gave her. Upon opening the phone, P.O. LaPorta observed "a number of apps, including a calculator app, which is a vault to secret files, folders, videos, what have you." Because she was familiar with this calculator app as being something that can hide photos, images and videos, she was concerned as to what might be in the vault app. The vault app had a different password, and she asked the defendant for it.   In response the defendant allegedly said "I'm going to jail."   P.O. Duffy told him that was not necessarily so and that it all depended on what was on the phone.   The defendant allegedly replied that he had "child pornography" on the phone.   T1, pp. 41-42, 51-53; T2, p. 19.   After making a second request, the defendant supplied the password to the vault app.   The vault app also required the defendant's fingerprint to open the app and the defendant opened the app.   A review of the contents of the vault app established that it contained "many videos" depicting child pornography.

The Samsung phone also contained a cloud app that could store photos and videos which required another password to open which the defendant supplied after

4

being asked to do so.   A brief review of this app disclosed descriptive titles of videos of young boys engaged in child pornography.   At this point, the probation officers decided it was time to seek the assistance of law enforcement officers since they did not have the forensic ability to retrieve and preserve the videos that were observed on the Samsung phone.   T1, pp. 42-43, 53; T2, pp. 19-25, 65-71.

The probation officers normally would contact either Detective Schmidt or Detective Hockwater who were members of a task force that investigates child pornography cases.   As a result, Detective Schmidt was called by P.O. Duffy, and he appeared at the defendant's residence approximately 10-15 minutes after the call.   T1, p. 43; T2, pp. 25-27, 72, 94-99.   P.O. LaPorta showed the videos that she had observed on the defendant's Samsung phone "so he could see for himself that it was in fact child pornography."   T1, pp. 53-55; T2, pp. 29, 72, 98-100.

Detective Schmidt then entered the defendant's bedroom and asked the defendant if he could talk to him after he introduced himself.   Detective Schmidt also advised the defendant that he did not have to talk to him.   The defendant responded that he would talk to Detective Schmidt and that he "wanted to help."   The defendant described "how he went about receiving [the videos]" and "the terms he used to gain those videos."   T1, pp. 61-62; T2, pp. 30, 73-76, 80, 86-87, 100-105, 113, 117-118, 120-121, 124, 136.

The defendant was not arrested that day, but the Samsung phone was seized by the probation officers since possession of it by the defendant was in violation of the terms of his probation.    The probation officers then "transferred [the Samsung phone] to Detective Schmidt to preserve the evidence that is on the phone" for the probation department since it contained evidence establishing that the defendant violated his probation conditions.    T1, pp. 61-64; T2, pp. 31-34, 102, 105-106.    (*See* Government Exhibit 1, ¶s 26, 32, 33, 35).

Thereafter, Detective Schmidt utilized a digital camera to record two of the videos that were on the defendant's Samsung phone, and a search warrant authorizing the search and seizure of evidence contained in the vault account was obtained.    (*See* Government Exhibit 6).    T2, pp. 109-110.

## DISCUSSION AND ANALYSIS

The government presented three witnesses, namely Probation Officers Duffy and LaPorta and Detective Eric Schmidt who was a member of the FBI task force dealing with child pornography.    After observing their demeanor during their testimony, this Court finds all three to be completely credible.    The defendant did not call any witnesses and did not testify in his own behalf nor present any other substantive evidence at the evidentiary hearing.

## A.   The Home Visit and the Search of the Cell Phone

The defendant asserts that the seizure and search of his cell phone was not only unreasonable, it was illegal since it was done without a search warrant and therefore the evidence seized from the phone must be suppressed.   Dkt. #62, p. 23. The defendant also argues that "the conditions set by the sentencing court that he was to permit warrantless searches was invalid because the condition was not based upon reasonable suspicion."   Dkt. #62, p. 23.   Both arguments of the defendant are rejected by this Court as being without legal merit for the reasons that follow.

As a result of his conviction for having violated New York Penal Law 110-263, the Hon. Kenneth F. Case imposed a sentence of six (6) years of probation on the defendant which included specific standard and "special sex offender conditions of probation."   *See* Government Exhibit 1.   The defendant acknowledged and accepted these conditions and agreed to abide by them by affixing his signature and date of signing same on March 15, 2016.   Government Exhibit 1, p. 6.   Applicable to the case at bar are the following conditions of probation that the defendant acknowledged, accepted and agreed to:

> 6.   Probationer shall submit to **warrantless search of person, property, residence or vehicle upon the request of the Probation Department.   Probationer shall acknowledge and agree that any law enforcement officer may assist the Probation Department in this search.**

7

33. **Probationer shall not** purchase, **possess, control or have access to** any computer, nor **any device with Internet capabilities (for example**, computer, **cell phone**, gaming system) nor shall you have any Internet account (for example, email, instant messaging; social networking sites) **without the prior written permission of the Probation Officer**.   Specific exceptions pertaining to your employment or educational program will be determined by the Probation Department. If permission is. granted, you will be required to agree to the COMPUTER & INTERNET USE AGREEMENT

34. Probationer shall not enter adult bookstores, sex shops, topless/nude bars, or other establishments at which there are performed or shown erotic plays, motion pictures, or other exhibits. **You shall not utilize sexually oriented services telephonically, electronically**, by mail, **or by any other means**. **You shall not possess or view any pornographic**, erotic or obscene books, magazines, photographs, videotapes, websites, films, plays or other exhibitions. You shall provide the Probation Officer copies of any cable, Internet, satellite, cell/telephone, and credit card bills upon request.

35. **Probationer shall not own, rent or possess a cell phone with picture taking capabilities or cameras** or video recorders for capturing images.

37. **Probationer shall submit to warrantless searches of your person, property, residence**, vehicles, business, **computer and its contents, cell phones and any storage Media**, including off site storage, **performed by Probation staff or their designee in order to monitor your compliance with the Order and Conditions of Probation for pornographic material and/or contraband. You will allow the seizure of any contraband for further investigation**. Any items determined to be in violation of your Order and Conditions of Probation will not be returned to you and will be destroyed.

Government Exhibit 1 (emphasis added).

Whether the conditions of probation imposed on the defendant by Judge Case complied with New York State law is irrelevant.   What is required is "reasonableness" to search as commanded by the Fourth Amendment to the United States Constitution.   The United States Supreme Court addressed this issue of state law compliance in *Virginia v. Moore*, 553 U.S. 164, 172 (2008) wherein in stated:

> In *California v. Greenwood,* 486 U.S. 35, 108 S.Ct. 1625, 100 L.Ed.2d 30 (1988), we held that search of an individual's garbage forbidden by California's Constitution was not forbidden by the Fourth Amendment. "[W]hether or not a search is reasonable within the meaning of the Fourth Amendment," we said, has never "depend[ed] on the law of the particular State in which the search occurs." *Id.,* at 43, 108 S.Ct. 1625. While "[i]ndividual States may surely construe their own constitutions as imposing more stringent constraints on police conduct than does the Federal Constitution," *ibid.,* state law did not alter the content of the Fourth Amendment.
>
> We have applied the same principle in the seizure context. *Whren v. United States,* 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996), held that police officers had acted reasonably in stopping a car, even though their action violated regulations limiting the authority of plainclothes officers in unmarked vehicles. We thought it obvious that the Fourth Amendment's meaning did not change with local law enforcement practices—even practices set by rule. While those practices "vary from place to place and from time to time," Fourth Amendment protections are not "so variable" and cannot "be made to turn upon such trivialities." *Id.,* at 815, 116 S.Ct. 1769.

Because the ruling set forth in *United States v. Knights*, 534 U.S. 112

(2001) is directly applicable to the resolution of the issue herein, I have intentionally

sacrificed brevity by quoting at length from that decision.

> The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." [Defendant's] status as a probationer subject to a search condition informs both sides of that balance. "Probation, like incarceration, is 'a form of criminal sanction imposed by a court upon an offender after verdict, finding, or plea of guilty.'" Probation is "one point ... on a continuum of possible punishments ranging from solitary confinement in a maximum-security facility to a few hours of mandatory community service." Inherent in the very nature of probation is that probationers "do not enjoy 'the absolute liberty to which every citizen is entitled.'" Just as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens. ... In assessing the governmental interest side of the balance, it must be remembered that "the very assumption of the institution of probation" is that the probationer "is more likely than the ordinary citizen to violate the law." ... The State has a dual concern with a probationer. On the one hand is the hope that he will successfully complete probation and be integrated back into the community. On the other is the concern, quite justified, that he will be more likely to engage in criminal conduct than an ordinary member of the community. ... We hold that the balance of these considerations requires no more than reasonable suspicion to conduct a search of this probationer's house. The degree of individualized suspicion required of a search is a determination of when there is a sufficiently high probability that criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable. Although the Fourth Amendment ordinarily requires the degree of

probability embodied in the term "probable cause," a lesser
degree satisfies the Constitution when the balance of
governmental and private interests makes such a standard
reasonable.   Those interests warrant a lesser than
probable-cause standard here.   When an officer has
reasonable suspicion that a probationer subject to a search
condition is engaged in criminal activity, there is enough
likelihood that criminal conduct is occurring that an intrusion
on the probationer's significantly diminished privacy interests
is reasonable.   The same circumstances that lead us to
conclude that reasonable suspicion is constitutionally
sufficient also render a warrant requirement unnecessary.

*Id.* at 118-121 (internal citations omitted).

In revisiting its holdings in *Knights*, the Supreme Court expressly stated
that it "considered the facts that Knights' probation order clearly set out the probation
search condition, and that Knights was clearly informed of the condition" and "concluded
that under these circumstances, Knights' expectation of privacy was significantly
diminished."   The Court also :concluded that probation searches, such as the search of
Knights' apartment, are necessary to the promotion of legitimate governmental
interests."   It is also pointed out that in evaluating the degree of intrusion into Knights'
privacy, the Supreme Court found his probationary status to be "salient."   *Samson v.
California*, 547 U.S. 843, 848-849 (2006).

P.O. Duffy testified that when she held her "initial supervision meeting"
with the defendant, she went "through each individual condition of probation" with him
and that she explained each condition to him which he understood.   T1, pp. 27-28, 29-
30.   The defendant also acknowledged and accepted the conditions of probation by

signing and dating the form containing them.    *See* Government Exhibit 1.    As a result, it has been clearly established that the defendant was aware of the conditions of probation, including conditions numbered 6, 33, 34, 35 and 37 thereby "significantly diminish[ing] [his] expectation of privacy."

It is also pointed out that condition number 4 authorizing home visits by the probation officers to defendant's home does not require "reasonable suspicion" before such a visit may be made.    As the Court of Appeals for the Second Circuit has stated, "a home visit is far less intrusive" than a search and therefore home visits by a probation officer "are not subject to the reasonable suspicion standard applicable to probation searches under *Knights*."    *United States v. Reyes*, 283 F.3d 446, 462 (2d Cir.), *cert. denied* 537 U.S. 822 (2002).    Therefore, Probation Officers Duffy and LaPorta had a legal right, in accordance with defendant's probation condition number 4, to conduct a "home visit" at this residence on August 8, 2019 as part of their official duties in determining whether the defendant was complying with all of the conditions of his probation.

It is at the arrival of the defendant's residence on August 8, 2019 that the facts begin to unfold which, taken in their totality, resulted in "reasonable suspicion" that something amiss or improper may be going on with the defendant in the context of his compliance with his probation conditions.    T2, pp. 7-8.

12

Both Probation Officers Duffy and LaPorta testified that after the bell to defendant's residence was wrung and the door knocked on at the scheduled home visit appointment time, there was an unusual delay in answering by the defendant which necessitated a repeating of bell ringing and knocking.   T1, pp. 37-38.   This delay "seemed longer than normal."   T1, pp. 37-38; T2, pp. 7, 9.

When the defendant answered the door, P.O. Duffy asked him "Zach, what took you so long, you knew we were coming?"   The defendant, at that point, "was acting a little off, he was a little bit jittery, a little nervous;" he "appeared flustered, a little bit flushed, he was just off; he looked kind of sweaty to [her], like something was going on."   P.O. Duffy asked him, "What is going on Zach?"   T1, pp. 37-38; T2, p. 10. Thereupon, the officers entered the residence with the defendant and went into the defendant's bedroom where they usually met when a home visit was conducted for privacy reasons.   T1, p. 38.   P.O. Duffy had the defendant take a seat on his bed for "safety" reasons because of the "confined area."   Both officers continued to believe that "something was off;" the defendant was not looking at them; he appeared to be "shifty," "flustered," "not knowing what was going on" even though he knew they were coming for a home visit.   P.O. Duffy again asked the defendant, "Zach, what is going on?"   T1, p. 39; T2, pp. 12-13.   At that point, P.O. LaPorta noticed a power cord next to the defendant's bed "with several wires going all over the place" and she asked the defendant, "What are all these cords, wires for?"   The defendant responded that "one was for his flip phone; one was for a vape."   T2, p. 13.   However, P.O. LaPorta

13

observed another cord that she could see that was "leading to his bed underneath his pillows" which she then "followed to see what was attached to the cord and it was a Samsung Galaxy phone."   T2, pp. 13-14.

As soon as P.O. LaPorta recognized the Samsung Galaxy cell phone, she concluded that the defendant was in violation of his probation conditions "because he is not to possess a smart phone with internet capabilities or picture taking capabilities," T2, pp. 16-17.   *See* Government Exhibit 10; *see also* Government Exhibit 1, ¶s 33, 35. She then asked the defendant what the password to this cell phone was.   P.O. Duffy also admonished the defendant at this time by telling him that he "[knew] that [he] was not supposed to have this phone" and asked him "how long" he had it, and the defendant responded, "Since the beginning of probation."   T2, pp. 17, 19.

The factual circumstances described above and considered in their totality clearly established "reasonable suspicion" for Probation Officers Duffy and LaPorta to conclude that at a minimum the defendant was violating his conditions of probation and more seriously may be involved in criminal activity in violation of New York Penal Law relating to sex offenders involving children based on his sex offender conviction.   Both officers were well experienced.   P.O. Duffy had eleven (11) years' experience as a probation officer with ten (10) years' experience involving sexual offenses.   T1, p. 4. P.O. LaPorta had fifteen (15) years' experience as a probation officer.   T2, p. 4.   It certainly was not unreasonable for them to take into account the delay by the defendant

14

in coming to the door of the residence, his nervousness and described body language, and the observation of a power cord and wires leading to something in his bedroom and conclude, based on those observations, that there was "reasonable suspicion" to believe that something was amiss with respect to the defendant and that violations of his probation conditions were occurring.   This concern was reflected in P.O. Duffy's questions to the defendant when she asked him, "Zach, what took you so long [to answer to door], you knew we were coming;" and "Zach what is going on?" when they first entered the defendant's bedroom.   T1, pp. 38-39.   The power cord with wires leading from it in the defendant's bedroom were in plain sight when observed by Probation Officers Duffy and LaPorta and this observation prompted P.O. Duffy to ask the defendant what "those cords were for" since she knew that the defendant was "not supposed to have a smart phone or any internet capable device, particularly with his condition, with his convictions."   T1, pp. 39-40.   This led to additional questions of the defendant by P.O. Duffy as part of her probation supervision duties in supervising the defendant because she "felt something wasn't right."   T1, p. 40.

Since "reasonable suspicion" had now been established, Probation Officers Duffy and LaPorta had the legal right to continue investigating the matter as part of their overall duties of supervising the defendant and determining whether he was complying with his conditions of probation as well as "promot[ing] legitimate government interests."   As the Supreme Court stated:

> When an officer has reasonable suspicion that a probationer
> subject to a search condition is engaged in criminal activity,
> there is enough likelihood that criminal conduct is occurring
> that an intrusion on the probationer's significantly diminished
> privacy interests is reasonable.   The same circumstances
> that lead us to conclude that reasonable suspicion is
> constitutionally sufficient also render a warrant requirement
> unnecessary.

*Knights, supra* at 121.


This continued investigation also allowed the probation officers to require the defendant to turn over the Samsung Galaxy phone to them and provide the appropriate passwords to the phone so as to allow access to the internal contents on the phone.   Furthermore, by agreeing to the conditions of probation, Government Exhibit 1, the defendant consented to a warrantless search of this cell phone and the "seizure of any contraband for further investigation."   Government Exhibit 1, ¶ 37.   The continued search of the defendant's Samsung Galaxy phone by Probation Officers Duffy and LaPorta was a continuing supervision of the defendant's compliance with the conditions of his probation because the "risk of recidivism posed by sex offenders is frighteningly high."   *Smith v. Doe*, 538 U.S. 84, 103 (2003); *McKune v. Lile*, 536 U.S. 24, 34 (2002).

### B.   The Assistance of Detective Schmidt

The defendant asserts that the utilization of Detective Schmidt by the probation officers constituted a violation of his Fourth Amendment rights since Detective Schmidt undertook an initial review of the defendant's cell phone at the residence and thereafter "conducted a separate search to determine whether child pornography had been downloaded to the phone and to a personal cloud storage and file hosting service."   Dkt. #35, p. 46, ¶ 110.   Basically, the defendant has asserted a "stalking horse" defense which is rejected.

When P.O. Duffy first saw the Samsung Galaxy phone that was found in the defendant's bedroom, she knew that the phone was a "smart phone" which had a camera and had internet capabilities, the possession of which by the defendant was in violation of his probation conditions.   T1, pp. 48-49.   P.O. Duffy and P.O. LaPorta undertook a brief examination of the contents of this cell phone and observed that it contained "a specific app that people put on their phones . . . to hide documents and pictures that they don't want anyone else to see.   It's a vault that you can only get in with a password, so they asked the defendant for the password to this vault in their capacities as probation officers, which the defendant supplied.   Upon entering this vault app, Probation Officers Duffy and LaPorta "immediately saw several pornographic

17

videos and pictures of young boys engaged in sexual acts with adult males.   At this point, P.O. Duffy decided they had seen enough and that it was "time to call somebody with the expertise of forensic analyzation of the phone."   Because the officers were afraid "something would get erased," they kept the vault app open since they didn't "know anything about phones or the technology,"   T1, pp. 41-43.

P.O. Duffy knew Detective Eric Schmidt as a result of having worked with him in the past and considered him to be an expert in the area of child pornography by reason of his work as both a member of the Tonawanda Police Force and a "special task force for missing and exploited children" and therefore she decided to call him and ask him to "aid [them] in preserving this [phone content] and to do an analysis of the phone."   T1, pp. 43, 53.   As of this point in time on August 8, 2019, Detective Schmidt was not aware of their home visit with the defendant nor did the probation officers "coordinate at all with Task Force Officer Schmidt prior to going to this home visit" of the defendant.   T1, p. 54.

When P.O. Duffy made contact with Detective Schmidt, she advised him of where they were and with whom and that she and P.O. LaPorta had "found a secreted phone" which they "were able to open up with passwords that [the defendant] gave [them] and that there is child pornography on it" and asked "can you come and help us."   T1, pp. 54-55.

18

Detective Schmidt testified that he received a call on August 8, 2019 from P.O. Duffy whom he knew from working with her in the past by extracting images on cellular phones.   T2, pp. 95-97.   However, he had no knowledge that Probation Officers Duffy and LaPorta were going to conduct a home visit of the defendant prior to the call of August 8, 2019.   T2, p. 98.   In the call, P.O. Duffy asked him if he could come to the defendant's residence and "assist them in preserving some images and videos that they had located on a cell phone."   T2, p. 97-98.

When he arrived at the defendant's residence on August 8, 2019, P.O. LaPorta had a cell phone in her hand which belonged to the defendant, and she described what she and P.O. Duffy had seen on the phone which was still open.   He looked at the open phone and observed videos which he deemed to be child pornography.   T2, p. 99.

After conferring with P.O. LaPorta for about 10 minutes, he followed her into the defendant's bedroom and introduced himself to the defendant and told him that he was a detective with the Tonawanda Police Department and that he was there "to assist the probation department."   He also advised the defendant that "he did not have to talk to [him] if he didn't want to but that he would be willing to listen."   The defendant responded by telling Detective Schmidt that he would talk to him and that he wanted to help.   T2, pp. 100-103, 118.

19

The defendant told Detective Schmidt that "there was going to be child porn on the phone," and they conversed with each other for approximately 10-15 minutes all during which the defendant appeared calm.   T2, 103-105.   Detective Schmidt did not give *Miranda* warnings to the defendant because the defendant was not under arrest.   T2, p. 123.

Because the defendant was not allowed to have the Samsung cell phone in his possession under the terms of his probation, the probation officers took the phone into their possession and gave a receipt for the phone to the defendant.   T2, pp. 31-32.   *See also* Government Exhibit 7.   This cell phone was then "transferred" by the probation officers to Detective Schmidt in order to preserve the evidence on the phone for the probation department.   In return, Detective Schmidt gave a receipt for the phone to the probation officers.   T2, pp. 32-33, 106.   *See also* Government Exhibit 9.

Thereafter, Detective Schmidt left the defendant's residence with the Samsung cell phone and upon arrival at his office, he "utilized a digital camera to record two of the videos from the [vault] application" on the defendant's phone.   He also conducted "an extraction of the phone [contents] using Cellebrite" as he had been requested to do by Probation Officers Duffy and LaPorta.   T2, pp. 107-108, 128. Ultimately, Detective Schmidt obtained a search warrant for the defendant's "Keepsafe" account which related to the vault application on the defendant's phone.   This account was searched, and child pornography was found in it.   T2, pp. 109-110, 112.   *See also*

20

Government Exhibit 6.


Since Probation Officers Duffy and LaPorta were lawfully in the defendant's residence as part of their duties as probation officers conducting a home visit of the defendant, the "plain view" doctrine applies.   Probation Officers Duffy and LaPorta simply glanced around while in the defendant's bedroom and observed the power cord with wires leading from it with one of those wires going to the defendant's bed and underneath a pillow on it.   Once it was determined that this wire had a smart phone attached to it, that phone constituted "contraband" since the defendant was not allowed to have possession of such a device.   As the Second Circuit Court of Appeals quoted with approval:

> Contraband that falls within the plain view of a probation officer who is justified [in] being in the place where the contraband is seen may properly be seized by the probation officer," if it is "immediately apparent that the item is contraband with respect to the supervisee." Committee on Criminal Law of the Judicial Conference of the United States, Model Search and Seizure Guidelines (1993), at VII, *reprinted in* Supervision of Federal Offenders, app. C, at 6; *cf. United States v. Kiyuyung,*171 F.3d 78, 83 (2d Cir. 1999) ("Under the 'plain view' exception [to the warrant requirement], 'if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant.'") (quoting *Minn. v. Dickerson,*508 U.S. 366, 375, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993)). That is, "[a]n item that is . . . observed in plain view may be seized if the probation officer has reasonable grounds to believe that the item is contraband or constitutes evidence of a violation of a condition of release." Model Search and Seizure Guidelines

(1993), at VII, *reprinted in* Supervision of Federal Offenders,
app. C, at 6.

*United States v. Reyes, supra* at 468.

The *Reyes* court went on to say that probation officers "may also consign
[their] authority to other law enforcement officers . . . by notifying them of the discovery"
since "there is nothing improper about a probation officer adopting a more modest or
cautious approach to seizures than is actually permitted by law – one that permits
probation officers to rely on law enforcement officers to take hold of the contraband."
*Id.* at 470-471.

As set forth in paragraph 6 of the probation conditions (Government
Exhibit 1), the defendant expressly agreed "to submit to a warrantless search of [his]
property upon the request of the Probation Department" and also "acknowledge[d] and
agree[d] that any law enforcement officer may assist the Probation Department in this
search."   This is exactly what Detective Schmidt was doing in response to the request
made by Probation Officers Duffy and LaPorta as members of the Probation
Department.   The Court of Appeals for the Second Circuit expressly held that:

> The so-called "stalking horse" theory does not exist as a
> matter of law, since the objectives and duties of probation
> officers and law enforcement personnel are often parallel
> and frequently intertwined.   Accordingly, the law permits
> cooperation between probation officers and other law

22

enforcement officials so that they may work together and
share information to achieve their objectives.

*Id.* at 470-471.

## C.   The Search of the "Keepsafe" Account of the Defendant

The defendant argues that Detective Schmidt "took the cell phone from
the [probation] officers only for the purpose of 'preserving' what was on the phone itself"
and that "he was never asked to search the phone by performing a Cellebrite extraction
of the phone once he went to F.B.I. headquarters."   Dkt. #62, p. 33.   As a result, he
asserts that "because the search was warrantless and was not authorized, all evidence
derived as a result must be suppressed" since this "warrantless search was a basis for
[Detective Schmidt's] warrant application" and therefore, "the search warrant as well
must be controverted and the evidence obtained therefrom suppressed."   Dkt. #62,
p. 33.   These assertions are refuted by the testimony of Detective Schmidt and the
testimony of P.O. Duffy.

Detective Schmidt testified as follows:

Q.   And then did you conduct an extraction of the phone
     using Cellebrite?

A.   Yes.

Q.   As was **requested**?

23

      A.    **Yes**.

Dkt. #51, p. 108, ff. 7-11 (emphasis added).

      The request of course refers to that made by P.O. Duffy to Detective

Schmidt.   Detective Schmidt further testified:

> Q. Okay. Did the probation officers I guess continue to ask
> for your assistance with respect to the phone, the
> defendant's phone?
> A. Yes, they did.
> Q. And what did they ask you to do with respect to that
> phone?
> A. I was asked if I could conduct a cellular extraction of
> the phone itself and generate a report for it.
> Q. And they asked you to do that?
>
> A. Yes, they did.
>
> Q. And did you agree to do that?
> A. Yes, I did.
> Q. So did you take possession of the phone?
>
> A. Yes.

Dkt. #51, pp. 105-106, ff. 16-25, 1-4.

> Q. All right. When the phone was given to you, does that
> change your attitude about your role in this case in terms of
> what you were doing in this case?
> You said that your role was different, something
> different than necessarily being a police officer earlier, but
> once you had the phone did you feel that you had the
> decision-making power to decide what to do with the phone?
> A. No, I was still assisting Probation at that point. Any
> decisions after that would have been something we
> discussed

together.
Q. When you say "we" --
A. When I say "we," I mean the probation officers and myself.   Again, I was still assisting them with their investigation and that was what I continued to do with making the video and with the cellular extraction.

Dkt. #51, p. 128, ff.2-16.


Q. **Okay. The extraction that was shown to you or discussed in paragraph 10 here, the Cellebrite extraction, that extraction was done to assist the Probation Department?**
A. **Yes.**


Dkt. #51, p. 135, ff. 1-4 (emphasis added).


P.O Duffy testified that she made the decision to call Detective Schmidt for assistance because he was someone with "the expertise of forensic analyzation of the phone" and she "wanted him to aid [them] in preserving this and to do an **analyzation of the phone**."   Dkt. #46, p. 43 (emphasis added).   "There was child pornography on [the phone] and it needed to be looked at for **further review**, preserved and looked at, at the FBI building for further review."   Dkt. #46, p. 62 (emphasis added).


Q. Okay. So you made a decision to give the phone to Detective Schmidt?
A.  Yes.
Q. Why did you make that decision?
A. Because there was child pornography on it.
Q. And did you need assistance reviewing that phone?
A. I needed assistance, yes, **reviewing that phone and** preserving it.

25

Q. Do you have forensic capabilities at your office
to review a cell phone?
A. No.
Q. **Do you know if Detective Schmidt has forensic
capabilities to review a cell phone?**
A. **Yes, I do.**
Q. **And what is it? He can do that?**
A. **Yes, he can do it.** He has done it on prior cases
for us on computers and cell phones. I know him to be
on the task force and we sign our electronics over to
them when they need review over at the FBI building.
Q. **Did you explicitly ask Detective Schmidt to
assist you and take possession of that phone?**
A. **Yes, I did.**

Dkt. #46, p. 64, ff. 3-24 (emphasis added).

Q. **[O]ne** of the reasons you gave
the phone over to Detective Schmidt was for him to preserve
what was on the phone, was that true?
A. Yeah.
Q. Okay.
A. **To help us with the technology. It's not our
expertise.**

Dkt. #48, p. 63, ff. 17-25.

The testimony of P.O. Duffy clearly establishes that she, on behalf of the

probation department, wanted Detective Schmidt to do a review **and analysis** of the

defendant's phone because it contained "child pornography" and because her probation

department did not have the technical skills and/or forensic equipment to undertake

such a task.   Admittedly "**one**" of the other purposes for giving the phone to Detective

Schmidt was to "preserve" it and its contents, but preservation was not the only reason

or purpose.   In order for the probation officers to determine how serious and to what

26

degree the defendant was in violation of his conditions of probation, they needed to know completely what was on the phone.   Since they were unable to make this determination, they sought the assistance of Detective Schmidt and asked him to undertake that review and analysis and prepare a report.   T1, pp. 43, 53-55.   Once again, "police officers and probation officers can work together and share information to achieve their objectives."   *Reyes, supra* at 463.   As the United States Supreme Court held and reaffirmed by the Second Circuit Court of Appeals, "[a] State's operation of a probation system . . . presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable cause requirements."   *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987); *United States v. Braggs*, 5 F.4th 183, 186 ((2d Cir. 2021).

Since the contents in the "vault" application on the defendant's phone were legally observed by Detective Schmidt in response to the probation officers' request for assistance, he was justified in using that information as a basis for obtaining a search warrant authorizing the search of the defendant's Keepsafe account and seizing the child pornography material contained in that account.

### D.    The *Miranda* Issue

The defendant asserts that "his statements were involuntary and were the subject of statements made without the benefit of *Miranda* warnings and while he was in

27

custody."   Dkt. #62, pp. 28-29.   For the reasons that follow, this argument is totally rejected.

Probation Officers Duffy and LaPorta and Detective Schmidt all testified that the defendant was not in custody or arrested on August 8, 2019 when they met with him.   The defendant was never told that he was arrested; nor were handcuffs or weapons displayed to him; nor was he restrained in any fashion.   The probation officers were merely conducting their probation supervision responsibilities by meeting with the defendant.   When Detective Schmidt first entered the defendant's bedroom, he introduced himself as a detective with the Town of Tonawanda police force who was there "to assist the Probation Department."   He also advised the defendant "that he did not have to talk to [him] if he didn't want to, but that he would be willing to listen."   It was the defendant who responded that he wanted to talk to Detective Schmidt and that he "wanted to help."   As far as Detective Schmidt was concerned, the defendant "could walk away from [him] if he wanted to."   T1, pp. 61-62; T2, pp. 30, 73-76, 80, 86-87, 100-105, 113, 117-118, 120-121, 124, 136.

At the end of the meeting with the defendant, the defendant was allowed to leave his residence and meet with his "sex offender treatment provider."   T2, p. 34.

In *Miranda*, the United States Supreme Court created a procedural mechanism with the purpose of establishing a prophylactic safeguard that would protect

28

a defendant from the coercive nature of custodial interrogation and preserve his Fifth Amendment privilege against self-incrimination.   However, before the requirements of *Miranda* come into play, there must be a form of "custody" of the person to be interrogated which "custody" amounts to the deprivation of "freedom of action in any significant way."   *Miranda v.* Arizona, 384 U.S. 436, 444 (1966); *Thompson v. Keohane*, 516 U.S. 99, 100-101 (1995); *Tankleff v. Senkowski*, 135 F.3d 235, 242 (2d Cir. 1998); *United States v. Newton*, 369 F.3d 659 (2d Cir. 2004).   The defendant bears the burden of proving custody.   *See United States v. Charles*, 738 F.2d 686, 692 (5th Cir. 1984).   In making a determination of whether such "custody" existed, the Court must consider the totality of the circumstances.   *California v. Beheler*, 463 U.S. 1131, 1125 (1983)*; Tankleff v. Senkowski, supra*.   "Although the circumstances of each case must certainly influence a determination of whether a suspect is 'in custody' for purposes of receiving Miranda protection, the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."   (Citation omitted).   *California v. Beheler* at 1125; *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).   The United States Supreme Court has "explicitly recognized that Miranda warnings are not required 'simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect'."   *California v. Beheler* at 1125; *Mathiason* at 495. See also: Illinois v. Perkins, 496 U.S. 292, 296-297 (1990).

"[A]bsent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial."   *United States v. Newton, supra* at 675; *United States v Mitchell*, 966 F.2d 92, 99 (2d Cir. 1992).

The Court of Appeals for the Second Circuit has ruled that:

> The test used in determining whether a defendant was in custody is an objective one that (a) asks whether a reasonable person would have understood herself to be subjected to restraints comparable to those associated with a formal arrest, and (b) focuses upon the presence or absence of affirmative indications that the defendant was not free to leave.   An accused is in custody when, even in the absence of an actual arrest, law enforcement officials act or speak in a manner that conveys the message that they would not permit the accused to leave.   *United States v. Kirsh*, 54 F.3d 1062, 1067 (2d Cir.) (internal quotation marks and citation omitted, *cert. denied*, 516 U.S. 927, 116 S.Ct. 330, 133 L.Ed.2d 230 (1995); *see also United States v. Morales*, 834 F.2d 35, 38 (2d Cir. 1987) (a custodial setting is evidenced by "inherently coercive pressures that tend to undermine the individual's will to resist and to compel him to speak").

*Tankleff v. Senkowski* at 243-244.

As the Court of Appeals for the Second Circuit has stated, the Supreme Court's decision in *Berkemer* "emphasizes that 'the only relevant inquiry [in determining when a person is in "custody" for purposes of Miranda] is how a reasonable man in the suspect's position would have understood his situation'."   *Cruz v. Miller*, 255 F.3d 77,

30

83 (2d Cir. 2001).

> It is the premise of *Miranda* that the danger of coercion results from the interaction of custody and official interrogation.   We reject the argument that *Miranda* warnings are required whenever a suspect is in custody in a technical sense and converses with someone who happens to be a government agent.

*Illinois v. Perkins*, 49 296-297 (1990).


The defendant has not presented any evidence to establish that it was "reasonable" for the defendant to believe that he was in custody or under arrest on August 8, 2019 when all of the evidence considered in its totality establishes otherwise. Since the defendant was not under arrest or in custody amounting to the deprivation of "freedom of action in any significant way," there was no requirement that *Miranda* warnings be given to him either by the probation officers or Detective Schmidt.


## **CONCLUSION**


Based on the foregoing, it is recommended that the defendant's motion to suppress evidence be denied in all respects.


It is hereby **ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:


31

This Report, Recommendation and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Crim.P. 58(g)(2) and Local Rule 58.2.

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance. *See, e.g., Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985 (1st Cir. 1988). **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek, et al. v. Canadair Ltd., et al.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 58.2 of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to**

**comply with the provisions of Rule 58.2, or with the similar provisions of**

**Rule 58.2 (concerning objections to a Magistrate Judge's Report,**

**Recommendation and Order), may result in the District Judge's refusal to**

**consider the objection.**

DATED:      Buffalo, New York
            July 7, 2022

                                *S/ H. Kenneth Schroeder, Jr.*
                                **H. KENNETH SCHROEDER, JR.**
                                **United States Magistrate Judge**