UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

v.

ZACHARY FEETERMAN,

　　　　　Defendant.

21-CR-44-LJV
DECISION & ORDER

---

## BACKGROUND

Defendant Zachary Feeterman has been indicted for receiving child pornography after a prior conviction related to sexual misconduct (18 U.S.C. §§ 2252A(a)(2)(A) and 2252A(b)(1)) and for possessing child pornography involving a prepubescent minor (18 U.S.C. §§ 2252A(a)(5)(B) and 2252A(b)(2)).  Docket Item 25.  On May 17, 2021, Feeterman filed omnibus pretrial discovery motions; motions to suppress his statements and evidence seized pursuant to a warrantless search and a search with a warrant; and a motion to dismiss based on speedy trial violations.  Docket Item 35 at 45-54.  The government responded on May 28, 2021, Docket Item 37, and Feeterman replied on June 3, 2021, Docket Item 38.

On June 4, 2021, United States Magistrate Judge H. Kenneth Schroeder, Jr., heard oral argument and scheduled an evidentiary hearing on Feeterman's motions to suppress.  *See* Docket Item 39 and prior unnumbered entry.  The hearing began on June 18, 2021, Docket Item 46, and continued on July 30, 2021, Docket Item 48, and September 30, 2021, Docket Item 51.  Three witnesses testified for the government—

Erie County Probation Officer Teresa Duffy, Erie County Probation Officer Nicole LaPorta, and Town of Tonawanda Police Detective Eric Schmidt—and eleven exhibits were admitted into evidence during the government's case.  Docket Items 46, 48, and 51; *see also* Docket Item 104.  Other than by submitting an affidavit in support of his motions, Docket Item 35-1, Feeterman did not present any evidence or call any witnesses.  *See* Docket Items 46, 48, and 51.

After several extensions of time requested by the defendant, *see* Docket Items 52-60, the parties filed post-hearing memoranda of law on January 10, 2022, Docket Items 61 and 62, and the government responded to Feeterman's submission a week later, Docket Item 63.  On July 7, 2022, Judge Schroeder issued his Report, Recommendation and Order ("RR&O"), finding that Feeterman's motions to suppress evidence and his statements, Docket Item 35, should be denied.[1]  Docket Item 69.

More specifically, Judge Schroeder found that the search resulting in the discovery of Feeterman's cell phone was appropriately based on reasonable suspicion and that the continued investigation, including warrantless searches of Feeterman's password-protected cell phone and a password-protected vault application on the cell phone, were appropriately based on Feeterman's consent.  *Id.* at 6-23.  Judge Schroder also found that all three government witness who testified at the hearing were credible,

---

[1] Judge Schroeder's RR&O did not address Feeterman's motion to dismiss the indictment based on Speedy Trial violations.  *Id.*  That motion is the subject of a separate Report, Recommendation and Order issued by Judge Schroeder on November 2, 2022, Docket Item 79, to which Feeterman has filed objections, Docket Item 88.  This Court heard oral argument on those objections on January 3, 2023. Docket Item 94.  Further submissions relating to those objections were filed on January 23, 2023, and January 26, 2023, Docket Items 101 and 102, and further oral argument on those objections is scheduled for February 16, 2023.  Those objections will be addressed in a separate Decision and Order.  *See* Docket Items 94 and 100.

Docket Item 69 at 6, and that Detective Schmidt was justified in relying on the fruits of his warrantless search to apply for a search warrant to search the vault application. *Id*. at 23-27. Finally, Judge Schroeder found that because Feeterman was never in custody, *Miranda* warnings were not required. *Id*. at 27-31.

Feeterman timely objected to the RR&O on July 22, 2022, Docket Item 70, and, after a brief extension of time, filed a memorandum of law in support of his objection, Docket Item 74. The government responded on September 2, 2022. Docket Item 75. After Feeterman did not reply, this Court heard oral argument on October 19, 2022, Docket Item 77.

Both parties then filed supplemental briefing requested by the Court on the issue of whether the state court probation condition prohibiting access to the Internet was unconstitutional and, if so, whether the searches conducted by the probation officers were therefore illegal. Docket Items 80 and 87. The Court heard further argument on January 3, 2023, and the parties submitted additional memoranda about whether the government had preserved the argument that the probation and law enforcement officers who conducted the search were acting in good faith. *See* Docket Items 95 and 96. This Court then took Feeterman's objection to Judge Schroeder's July 7, 2022 RR&O under advisement on January 9, 2023. *See* Docket Item 100.

## LEGAL PRINCIPLES

A district court may accept, reject, or modify the findings or recommendation of a magistrate judge. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3). The court must review *de novo* those portions of a magistrate judge's recommendation to which a party objects. 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3)

This Court has carefully and thoroughly reviewed the RR&O, the objections, the response, the supplemental submissions, and the materials submitted to Judge Schroeder, including the transcripts of the evidentiary hearing and the exhibits.  Based on that *de novo* review and for the reasons that follow, this Court accepts and adopts Judge Schroeder's RR&O in its entirety.  Feeterman's motions to suppress are denied.

## FACTS[2]

On March 15, 2016, Feeterman was sentenced in state court to a six-year term of probation for attempted criminal possession of child pornography.  Docket item 104 at 1; Docket Item 46 at 8.  At sentencing, Erie County Court Judge Kenneth F. Case imposed eight standard probation conditions, twelve general conditions, and nineteen special sex offender conditions; Feeterman initialed each condition during the sentencing proceeding.  Docket Item 104 at 2-6; Docket Item 46 at 27.  Feeterman then participated in an initial supervision meeting with his Probation Officer, Teresa Duffy.  Docket Item 46 at 27.  During this meeting, each condition was read and reviewed with Feeterman, and Officer Duffy was satisfied that Feeterman understood each condition.  Docket Item 46 at 27-30.

---

[2] The facts are taken from the transcripts of the evidentiary hearing conducted by Judge Schroeder on June 18, 2021 (Docket Item 46), July 30, 2021 (Docket Item 48), and September 30, 2021 (Docket Item 51) and the hearing exhibits, Docket Item 104. Based on Judge Schroeder's credibility finding, Docket Item 69 at 6, this Court credits the testimony of the hearing witnesses.  *Carrion v. Smith*, 549 F.3d 583, 588 (2d Cir. 2008) ("[A] district judge should normally not reject a proposed finding of a magistrate judge that rests on a credibility finding without having the witness testify before the judge") (quoting *Cullen v. United States*, 194 F.3d 401, 407 (2d Cir. 1999)).

Standard condition number 3 provides that the "[p]robationer shall truthfully answer all reasonable questions by the Probation Officer . . .."  Docket Item 104 at 2. Standard condition number 4 states in part that the "[p]robationer shall . . . permit the Probation Department to visit probationer at his/her residence or elsewhere."  *Id.*  The Erie County Probation Office conducts home visits at least quarterly; some are announced and some are unannounced.  Docket Item 46 at 5.

Probation officers occasionally will "request the assistance of other law enforcement officers" during home visits.  Docket Item 46 at 6.  For example, if probation officers "believe there is a crime that has occurred," they "will contact local law enforcement [to] do the actual arrest or investigation" or to aid them "in anything [they] may need while [they are] in the home."  *Id.*  Moreover, standard condition 6 provides that the "[p]robationer shall submit to [a] warrantless search of person, property, residence or vehicle upon the request of the Probation Department" and that the [p]robationer shall acknowledge and agree that any law enforcement officer may assist the Probation Department in this search."  Docket Item 104 at 2.

As part of special sex offender condition number 33, Feeterman was not permitted to purchase, possess, control or have access to any computer with Internet capabilities, including a cell phone, without permission.  *Id*. at 5.  If given such permission, Feeterman would have to comply with the "Computer & Internet Use Agreement."  *Id*. (some capitalization omitted).  In addition, special sex offender condition number 35 prohibited Feeterman from owning, renting, or possessing a cell phone with picture-taking capabilities.  *Id*.  Finally, special sex offender condition number 37 required Feeterman to "submit to warrantless searches of [his] person,

5

property, . . . cell phones[, etc.,] . . . performed by Probation staff or their designee in order to monitor [his] compliance with the Order and Conditions of Probation for pornographic material and/or contraband." *Id*.

Feeterman's term of probation began in March 2016; from then until August 7, 2019, Probation Officer Duffy conducted fifteen home visits. Docket Item 46 at 34-35. At those visits, Officer Duffy had the opportunity to observe Feeterman's behavior and gauge his reactions to her questions. *Id*. at 36. Officer Duffy testified that during each of these fifteen home visits, Feeterman always was cooperative and never was adversarial. *Id*.

The sixteenth visit, on August 8, 2019, was a scheduled home visit to the home Feeterman shared with his grandmother. *Id*. at 36-37. Feeterman was alone because his grandmother was on a short vacation. *Id*.

Probation Officers Duffy and LaPorta arrived at Feeterman's residence at approximately 10:00 a.m., rang the doorbell, and knocked on the door; after some delay, Feeterman answered. *Id*. at 38. Officer Duffy observed that Feeterman "was acting a little off" and that he seemed "a little bit jittery, a little bit nervous," and "flustered." *Id*. Officer LaPorta likewise noted that Feeterman appeared "flustered [and] flushed" and that he was "not making so much eye contact." Docket Item 51 at 10.

At prior home visits, Officers Duffy and LaPorta routinely met with Feeterman in Feeterman's bedroom for privacy and to be away from the barking dogs, and they followed that routine on this visit as well. Docket Item 46 at 38-39. Officer Duffy asked Feeterman to have a seat on his bed, and Feeterman complied. *Id*.

While Officer Duffy was speaking with Feeterman, Officer LaPorta observed "a power cord next to [Feeterman's] bed with several wires."  Docket Item 51 at 12-13. Feeterman told Officers Duffy and LaPorta that the cords were for his flip phone and a vape pen, but there was a third cord "leading to [Feeterman's] bed underneath his pillows."  *Id.* at 13.  Officer LaPorta followed that cord and found it attached to a Samsung Galaxy smart phone.  *Id.* at 13-16.  Because Feeterman was not permitted to possess a cell phone with picture taking capabilities, Docket Item 104 at 5, and because the Samsung Galaxy phone clearly had a camera, *id.* at 32-33, Officer LaPorta immediately knew that Feeterman's possession of this phone was a violation of his probation conditions, *see* Docket Item 51 at 17.

In response to questioning by Officer Duffy, Feeterman admitted that the phone was his and that he had possessed it "since the beginning of probation."  Docket Item 46 at 40; *see also* Docket Item 51 at 19.  Officer LaPorta then asked for the password, and Feeterman initially provided the incorrect password to access the phone.  *See* Docket Item 51 at 19-20; *see also* Docket Item 46 at 41.  After Feeterman provided the correct password, Officer LaPorta accessed the phone and saw a password-protected vault application disguised as a calculator application.  Docket Item 46 at 41; Docket Item 51 at 20-21.  Officer LaPorta testified that the vault application could hide photos, images, videos, and documents.  Docket Item 51 at 21.

Officer LaPorta then asked for the vault application password, and Feeterman responded, "I'm going to jail."  *Id.* at 21-22.  Officer Duffy said that depended on what was on the phone, and Feeterman said that he had "child pornography."  *Id.* at 22. Feeterman then supplied both the password and his fingerprint to access the vault

application.  *Id*.  The officers then inspected the vault application and a cloud application and indeed found child pornography.  *Id*. at 22-25.

Because neither Officer Duffy nor Officer LaPorta had the forensic ability to preserve the phone and its contents, they called Town of Tonawanda Police Detective Eric Schmidt.  *Id*. at 25-27, 98.  A short time later, Detective Schmidt arrived at Feeterman's home, looked at the child pornography, and spoke to Feeterman.  *Id*. at 29-30, 99-101.  Detective Schmidt told Feeterman that Feeterman did not have to speak to him, but Feeterman said that he wanted to help.  *Id*. at 101.

Detective Schmidt did not give *Miranda* warnings because Feeterman was not in custody.  *Id*. at 122-123.  During Feeterman's entire encounter with probation and law enforcement officers, the officers' duty weapons remained holstered.  Docket Item 46 at 45-46; Docket Item 51 at 8-9, 101-102.  Feeterman was never physically restrained, nor was he told that he was under arrest.  Docket Item 46 at 46; Docket Item 51 at 102. And Feeterman never asked to leave.  *Id*. at 35.

In response to Detective Schmidt's questions, Feeterman supplied him with the search terms and websites where he obtained the child pornography.  Docket Item 51 at 75.  The probation officers seized the Samsung Galaxy smart phone and gave it to Detective Schmidt.  Docket Item 46 at 64.  Detective Schmidt then copied two videos, extracted data from the phone, asked the vault-application company to preserve all data related to the account, and obtained a search warrant for the Keepsafe[3] vault account. Docket Item 51 at 33, 107-110.

---

[3] Keepsafe is a secure vault-storage application that looks like a calculator and that can be downloaded to a cellular phone (or other device).  Docket Item 37 at 3-4; Docket Item 51 at 99.  Vault-storage applications like Keepsafe are often used to hide

## DISCUSSION

Feeterman urges this Court to suppress the cell phone and its contents based on the warrantless search of his home, the phone, and its contents.  Docket Item 74.  He argues that even the lesser standard of reasonable suspicion applicable to probationers was not met here because the probation and law enforcement officers had no reason to suspect that they would find contraband before the illegal search began.  *Id*.  He says that the search warrant for the Keepsafe vault was unconstitutionally obtained with the fruit of the illegal warrantless search.  *Id*. at 7.  And he argues that his statements amounted to a custodial interrogation; that he did not knowingly, intelligently, and voluntarily waive his right to remain silent; and that he effectively was forced to acquiescence to the power of probation and law enforcement officers.  *Id*. at 11-13.

The government responds that reasonable suspicion was not necessary and that by giving the probation officers his password, Feeterman consented to the warrantless search.  Docket Item 75 at 12-13, 16-17.  Citing the Second Circuit's decision in *United States v. Braggs*, 5 F.4th 183 (2d Cir. 2021), the government argues that as long as a search by a probation officer "is reasonably related to the officer's duties," that search does not violate the probationer's rights.  *Id*.  The government also says that Police Detective Schmidt was authorized to conduct a warrantless search because he simply was assisting the probation officers in performing their duties.  Docket Item 75 at 17-19.  And the government says that because Feeterman was never restrained, because the entire encounter took place in his home, and because he never asked to leave, *Miranda*

_____

documents and photos.  Docket Item 46 at 41.  In this case, access to the Keepsafe application was both password and fingerprint protected.  Docket Item 46 at 52-53.

was not triggered and his statements should not be suppressed.  Docket Item 75 at 22-24.

At oral argument of his objections, Feeterman argued that his state court sentence—which included a condition that he have no Internet or computer access—violated his First Amendment rights and that the government's reliance on that condition to justify the warrantless search was inapposite.  Docket Item 80 at 2.  The Court requested supplemental briefing on whether the constitutionality of Feeterman's state court sentence was an issue that was properly before the Court, and those submissions were timely filed by both sides.  *See* Docket Items 80 and 87.

Now that briefing and oral argument on the objections are complete, the Court addresses the issues chronologically, reviewing and evaluating each step that occurred in connection with both the search and Feeterman's statements.

## A.  The Home Visit

Feeterman does not contest the routine visit to his home by members of the probation department—with good reason.  *See* Docket Item 74.  A routine visit by probation officers to a probationer's home does not violate a probationer's rights.  *See United States v. Reyes*, 283 F.3d 446, 457-461 (2d Cir. 2002).  And that is particularly true here because Feeterman explicitly agreed to this condition as part of his sentence.  Docket Item 104 at 2.  Moreover, the August 2019 home visit was scheduled with Feeterman who expected the probation officers to arrive when they did:  between 8:30 in the morning and noon or 1 o'clock in the afternoon.  Docket Item 46 at 37-38.  So nothing about the home visit raises any issues.

### B.  Questioning in Feeterman's Bedroom

Feeterman argues that the probation officers' decision to meet with him in his cramped bedroom caused him to reasonably conclude that he was not free to leave and that he had to answer the officers' questions.  Docket Item 74 at 10.  He says that he therefore was entitled to *Miranda* warnings before he was questioned.  *Id*. at 12.  The government responds that Feeterman was obliged to answer the questions posed to him by his probation officers during the home visit and that because Feeterman was not in custody, the protections offered by *Miranda* did not apply to him.  Docket Item 75 at 21.  This Court agrees with the government.

As a threshold matter, a probationer does not have the right to remain silent, particularly when a condition of probation requires the probationer to answer all reasonable questions posed to him by his probation officer.  *United States v. Conte*, 99 F.3d 60, 65-66 (2d Cir. 1996).

> A probationer does not have the right to remain silent or to have an attorney present "when called upon to respond to the supervision efforts of his probation officer." *United States v. Rea,* 678 F.2d 382, 390 (2d Cir.1982); *see generally Minnesota v. Murphy,* 465 U.S. 420, 424 n. 3, 104 S.Ct. 1136, 1140 n. 3, 79 L.Ed.2d 409 (1984) (citing *Rea* ). The duties to report as instructed by a probation officer and to answer questions posed by a probation officer are obligations integral to probationary status. "While a probationer is not deprived completely of his Fifth Amendment rights and may assert them, he runs the risk that his refusal to answer will lead to a charge of violation of probation." *United States v. Rea,* 678 F.2d at 390.

*Conte*, 99 F.3d at 65-66.  Here, standard condition 3 required Feeterman to truthfully answer all reasonable questions asked by his probation officer.  Docket Item 104 at 2.

So *Miranda* warnings were not required for that reason alone. But even if that were not true, Feeterman still would not be entitled to the relief he seeks.

To be entitled to the advice-of-rights protections under *Miranda,* a defendant must have been subjected to a "custodial interrogation." *Illinois v. Perkins*, 496 U.S. 292, 296 (1990). "[A]bsent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial." *United States v. Newton*, 369 F.3d 659, 675 (2d Cir. 2004). Because Feeterman was questioned in his home, *Newton* suggests that his interrogation was not custodial.

Feeterman says that even so, by taking him to his cramped bedroom to talk, the probation officers made any questioning custodial. Docket Item 74 at 10. But the decision to question Feeterman in his bedroom was entirely consistent with prior visits by probation officers to the home and was part of the routine meetings that Feeterman had with his probation officers. Docket Item 46 at 38. Feeterman lived with his grandmother, and during prior visits, probation officers met with him in his bedroom for privacy reasons and to get away from the barking dogs who lived there. *Id*. Although meeting with Feeterman elsewhere may have provided more comfort and space, meeting in Feeterman's bedroom did not escalate the routine home visit into a custodial interrogation.

Nor did the circumstances of the visit result in a custodial interrogation. In determining whether a defendant is in custody, "the ultimate inquiry is simply whether there [was] a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983). The only relevant question is "how a reasonable [person] in the subject's position would

have understood [his or her] situation." *Cruz v. Miller*, 255 F.3d 77, 83 (2d Cir. 2001).

To determine whether there was a restraint of freedom of movement akin to a formal

arrest, courts consider a variety of factors including: "(1) the interrogation's duration; (2)

its location (e.g., at the suspect's home, in public, in a police station, or at the border);

(3) whether the suspect volunteered for the interview; (4) whether the officers used

restraints; (5) whether weapons were present and especially whether they were drawn;

and (6) whether officers told the suspect he was free to leave or under suspicion."

*United States v. Schaffer*, 841 F.3d 166, 174 (2d Cir. 2017).  "[C]ourts rarely conclude,

absent a formal arrest, that a suspect questioned in [his or her] own home is 'in

custody.'"  *United States v. Faux*, 828 F.3d 130, 135 (2d Cir. 2016).

The entire encounter with Feeterman appears to have lasted less than two hours.

Docket Item 46 at 38 and Docket Item 51 at 33.  At all times during the encounter,

Feeterman remained seated in his bedroom in the home he shared with his

grandmother.  Docket Item 46 at 37-38 and Docket Item 51 at 123.  When a police

detective arrived to assist the probation officers, Feeterman was told that he did not

have to speak with the detective, but Feeterman said that he "wanted to help."  Docket

Item 51 at 100-101.  Although the probation and law enforcement officers each had their

duty weapons during the visit, those weapons remained holstered, and there is no

evidence that Feeterman's encounter with the probation and law enforcement officers

was anything but cordial.  Docket Item 46 at 46; Docket Item 51 at 8-9, 102.  Feeterman

was never physically restrained or told that he was under arrest, Docket Item 46 at 46,

nor did he ever ask to leave, Docket Item 51 at 35.

Analysis of the factors outlined in *Schaffer* leads to only one conclusion: Feeterman was not in custody at any time during his less-than-two-hour encounter with probation and law enforcement officers in his home on August 8, 2019.  For that reason, he was not entitled to *Miranda* warnings before he was questioned.

For many of the same reasons, any suggestion that Feeterman's decision to speak with the probation and law enforcement officers was not voluntary is belied by the record.  As discussed above, probation officers had visited Feeterman at his home sixteen times over three years.  On August 8, 2019, Feeterman was expecting the probation officers' visit.  *Id*. at 37-38.  Officers Duffy and LaPorta were dressed in their tactical gear, but their duty weapons remained holstered.  *Id*. at 45-46.  Detective Schmidt was even less imposing, dressed in a shirt, tie, and dress pants.  Docket Item 51 at 101.  There is no evidence that Feeterman was coerced or threatened; indeed, he was specifically told that he was not under arrest.  Docket Item 46 at 69.  So there is no reason to believe that Feeterman's decision to speak with the officers was anything but voluntary.

### C.  The Discovery and Search of the Cell Phone

Feeterman contends that by looking under the pillows on his bed and finding the cell phone, the probation officers violated his rights under the Fourth Amendment. Docket Item 74 at 9-10.  This Court disagrees.

Because he was on probation, Feeterman had a diminished expectation of privacy.  *See United States v. Knights*, 534 U.S. 112, 118 (2001); *United States v. Reyes*, 283 F.3d 446, 461 (2d Cir. 2002).  In fact, when a warrantless search of a probationer is supported by reasonable suspicion and authorized by a condition of

probation, that search is reasonable. *Knights*, 534 U.S. at 122; *Reyes*, 283 F.3d at 462. And in *Braggs*, the Second Circuit recently underscored and perhaps broadened that principle, holding that whenever a search is reasonably related to probation and law enforcement duties, "such a search is 'permissible' under the Special Needs framework and accordingly 'comport[s] with the Fourth Amendment.'" *Braggs*, 5 F.4th at 188 (quoting *United States v. Grimes*, 225 F.3d 254, 258 (2d Cir. 2000) (alteration in original)).

The search here easily meets that standard. Probation Officers LaPorta and Duffy were visiting Feeterman in connection with their law enforcement duties, and their decision to follow the electric cords under the pillows on Feeterman's bed fell comfortably within those duties. That is especially so because Feeterman was not allowed to access the Internet without permission or possess a cell phone with picture-taking capabilities. So the search was indeed reasonably related to probation and law enforcement duties. *See Braggs*, 5 F.4th at 188.

And even if, as Feeterman argues, the probation officers needed reasonable suspicion to search under the pillows, they had that suspicion. Before Probation Officers Duffy and LaPorta even saw Feeterman on the morning of August 8, 2019, their suspicions had been aroused. Feeterman had taken an unusually long time to answer the door even though he expected the officers' visit and knew when they would be coming. Docket Item 46 at 38. After answering the door, Feeterman's appearance and demeanor offered the officers little reassurance: Feeterman was acting "a little off"; he appeared "jittery," "nervous," "flustered," and "flushed"; he was "not making so much eye contact." Docket Item 46 at 38 and Docket Item 51 at 10.

After the officers and Feeterman went into the bedroom to talk, Officer LaPorta observed "a power cord next to [Feeterman's] bed with several wires" attached.  Docket Item 51 at 12-13.   Feeterman said that the cords were for his flip phone and a vape pen, *id*., but there was a third cord leading underneath the pillows on Feeterman's bed.  *Id*. at 13.  When Officer LaPorta followed that third wire, she found the cell phone.  *Id*.

So Officers Duffy and LaPorta knew that Feeterman was not permitted to possess certain electronic devices.  They saw that he was jittery and nervous.  And they observed an unexplained electric cord leading from a wall outlet to something under the pillows on Feeterman's bed.  Not only was following the cord part of their duties as probation officers, it also was based on a reasonable suspicion that illegal activity—or at least activity that violated Feeterman's conditions of probation—was afoot.

Feeterman argues that simply possessing the phone did not violate the conditions of his probation.  Rather, Feeterman says, unless that phone could access the Internet or take photographs, he was permitted to have it.   Docket Item 74 at 10.  And because the officers could not have known whether the phone had those features without searching it, Feeterman says, looking at the contents of the phone violated his rights under the Fourth Amendment.  *Id*.

 The more prudent and conservative approach may have been to obtain a warrant, and perhaps the officers should have done just that.  But under the circumstances here, the course followed by the officers did not violate Feeterman's Fourth Amendment rights.

First, it clearly was within the probation officers' duties to request the phone password so that they could determine whether Feeterman had violated the conditions

of his probation.  *See Braggs,* 5 F.4th at 186-188.  Feeterman was on state probation for possessing child pornography, and he was found hiding a cell phone which may well have had the capacity to take photos and access the Internet.  Indeed, a photo of the phone shows that it had a camera, *see* Docket Item 104 at 32-33, and the officers believed that by possessing the phone, Feeterman violated the conditions of his probation, *see* Docket Item 51 at 16-17.  In response to questioning by Officer Duffy, Feeterman admitted that the phone was his and that he had possessed it "since the beginning of probation"—more than three years.  Docket Item 46 at 40; *see also* Docket Item 51 at 19.  So even if, as Feeterman argues, his possession of a phone with disabled Internet and camera functions might have been permitted, the officers had more than enough reasonable suspicion to ask for that phone's password.

In his objection, Feeterman asserts that Probation Officers Duffy and LaPorta "insisted" that he provide them with his password and that by initially giving them the incorrect password, he refused to consent to the search.  *See* Docket Item 74 at 10-11.  But there is no factual support in the record for the first assertion and no logical support for the second.  Both Officer LaPorta and Officer Duffy testified that they "asked' Feeterman for the password, Docket Item 46 at 41; Docket Item 51 at 19, and Judge Schroeder—who saw them testify firsthand—found them credible, Docket Item 69 at 6.  So there is no reason to believe that Feeterman was forced to give up his password.

And Feeterman's argument that by giving the incorrect password he evidenced his refusal to consent seems to come from whole cloth.  After Feeterman initially gave the officers an incorrect password, Docket Item 51 at 20, Officer LaPorta simply said that "it didn't work," and Feeterman then provided the correct one.  *Id*. at 20.   Whether

Feeterman intentionally provided the incorrect password or whether his "jitter[iness]"

and "nervous[ness]" resulted in a mistake is unclear.  But regardless, Officer LaPorta's

saying that the password "didn't work" was not in any way inappropriate, Feeterman

never refused to comply, and Feeterman ultimately consented by voluntarily providing

the correct password to unlock the phone.  *Id.*  So the defendant's suggestion that he

refused to consent by providing an incorrect password is inapposite.

And even if all that were not true, Feeterman had consented to warrantless

searches in March 2016 when he accepted, acknowledged, and initialed the conditions

of his probation.  Docket Item 104 at 2.  Standard condition number 6 authorized a

"warrantless search of his person [and] property."  *Id.*  Likewise, special sex offender

condition number 37 authorized a "warrantless search of his cell phone."  *Id*. at 5.  So if

there were any doubt about whether Feeterman consented to the search that led the

probation officers to the contents of his phone, those conditions—which Feeterman had

accepted and acknowledged by initialing—dispel that doubt.

Once she had gained access to the phone, Officer LaPorta observed a

password-protected vault application on Feeterman's cell phone that was disguised as a

calculator application.  Docket Item 46 at 41; Docket Item 51 at 30-31.  From her

experience, Officer LaPorta knew that the vault application could be used to "hide

photos and images and videos and documents," and so she asked Feeterman for the

password to access the vault application.  Docket Item 51 at 21.  In response,

Feeterman said "I'm going to jail" and that he had "child pornography on the phone."  *Id*.

at 22.  He then gave the officers the vault password and used his fingerprint to access

the vault application.  Docket Item 51 at 22.

Feeterman challenges the search of the vault application.  But that challenge lacks merit as well.

First, Officer LaPorta's request for the vault password was both reasonably related to her duties as a probation officer, *see Braggs, supra,* and based on reasonable suspicion.  She had observed an application on the cell phone—disguised as a calculator application—that she knew could be used to hide photos and videos.  She had found the cellphone hidden under pillows, and she knew that the probationer she was supervising for possessing child pornography was nervous and jittery.  There was more than enough reason to suspect that Feeterman was hiding something on the phone, to believe that the vault was where he was hiding it, and therefore to ask for the password to the vault.

Feeterman's response to the request for the password—saying that he was going to jail because there was child pornography on the phone—simply confirmed what the officers suspected.  And Feeterman then clearly agreed to cooperate.  Indeed, he said that "he wanted to help . . . and to get the weight off his shoulders," and he provided the officers not only with the password for that vault but also with his fingerprint that they needed to enter it.  Docket Item 46 at 41-42; Docket Item 51 at 21-22.

So the officers searched the vault application not only with Feeterman's consent but with far more than the reasonable suspicion that Feeterman says they needed.  And because the officers did not violate any of Feeterman's rights before they found the hidden vault application, *see generally supra*, Feeterman's voluntary consent to search the vault was not tainted in any way.

Once inside the vault, the officers found videos of suspected child pornography. Docket Item 51 at 22-23.  Because they did not have the ability to "retrieve and preserve the videos that [they] saw on the defendant's phone," the probation officers then contacted Detective Schmidt for assistance.  Docket Item 46 at 43, 53-54; Docket Item 51 at 24-25, 97-98.  Schmidt provided that assistance, took custody of the phone, and copied two of the videos.  Docket Item 46 at 64; Docket Item 51 at 32.  He also extracted data from the phone, asked the vault application company to preserve all data related to Feeterman's account, and obtained a warrant to search the vault account. Docket Item 51 at107-110.

Feeterman challenges Detective Schmidt's participation in the search.  But there is no merit to that challenge either.   As the Second Circuit noted in *Reyes*, "[i]t is entirely appropriate for law enforcement officers providing support for a home visit 'to be on the scene' – a role that is 'predicated upon the probation officers' more limited law enforcement authority" and for law enforcement to "take hold of the contraband." *Reyes*, 283 F.3d at 470.  That is precisely what happened here.

For all those reasons, there was nothing about the probation visit, the discovery of the cell phone, or the subsequent search of that phone that violated any of the defendant's rights in any way. Feeterman's objection to Judge Schroeder's RR&O in connection with the warrantless search of the cell phone is therefore overruled.

20

### D.  The Search Warrant for Keepsafe Vault Account

Feeterman argues that because the information used to obtain the search warrant for his cell phone was illegally obtained, the search warrant is defective and any evidence derived from the subsequent search must be suppressed.  Docket Item 74 at 13.  Because the initial search of Feeterman's cell phone did not violate the Fourth Amendment, the search warrant obtained with the fruits of that search was not defective.  Feeterman's objection to the RR&O insofar as it addressed the search warrant therefore is overruled.

### E.  Judge Case's Sentence

Feeterman argues that the probation condition prohibiting him from possessing a computer or accessing the Internet was unconstitutional.  Docket Item 80.  But the condition imposed did not prohibit all access to computers or preclude all use of the Internet.  Rather, special sex offender condition 33 provided only that Feeterman needed the permission of his probation officer to possess a computer or cell phone with Internet capabilities. *See* Docket Item 104 at 5.  Along the same lines, it provided that if Feeterman obtained permission and could use Internet-capable devices, he was required to abide by the Computer and Internet Use Agreement.  *Id*.  And Feeterman was given permission to possess a computer without Internet access at his home, Docket Item 46 at 65, and to access the Internet at school.  *Id*.  So the condition is not as draconian as Feeterman suggests.

In fact, the condition is not very different than the condition imposed by this Court requiring those convicted of child pornography offenses to allow the probation office to monitor any Internet capable devices that they may use.  The Second Circuit has

approved that condition, *see United States v. Browder*, 866 F.3d 504, 512 (2d Cir.

2017); *United States v. Lifshitz*, 369 F.3d 173, 188-193 (2d Cir. 2004), and this Court

sees no reason why the condition imposed by the state court here would not similarly

pass muster.[4]

Finally, the validity of the condition imposed in state court is not properly before

this Court.  Probation officers are entitled to rely in good faith on court-imposed

conditions without questioning the constitutionality of those conditions.  *Cf. United

States v. Leon*, 468 U.S. 897 (1984) (applying good faith exception to exclusionary rule

for search warrants).  Indeed, a different rule would profoundly interfere with the

supervision of those on parole, probation, or supervised release.  And for that reason it

would be imprudent to revisit the constitutionality of the condition that led to the search

here.

So because the condition imposed in state court was not unconstitutional, and

because even if it was, the officers' good faith[5] reliance on it insulates their conduct

from challenge, Feeterman's objection based on his challenge of his conditions of

probation is overruled.

---

[4] If the condition prohibited all use of computers or the Internet under any
circumstances, the analysis might well change.  But as just noted, it does not.

[5] During oral argument on January 3, 2023, the defendant questioned whether
the government had preserved the good faith argument as it related to the probation
and law enforcement officers' performance of their duties.  At the Court's request, both
parties filed supplemental submissions addressing this issue.  Docket Items 95 and 96.
Based on those submissions and the record in this case, this Court agrees with the
government that it did indeed preserve the good faith argument.  While the government
may not have used the words "good faith" in making the argument, Judge Schroeder
recognized the government's position as including an argument based on good faith,
*see* Docket Item 46 at 19; Docket Item 48 at 76, and this Court does as well.

## **CONCLUSION**

For the reasons stated above and in Judge Schroeder's RR&O, Feeterman's

motions to suppress his statements, his cell phone, and the contents of that cell phone

are DENIED.

SO ORDERED.

Dated:   February 8, 2023
            Buffalo, New York


*s/ Lawrence J. Vilardo*
LAWRENCE J. VILARDO
UNITED STATES DISTRICT JUDGE